## Taylor's Estate

*Mowitz & Kohlhas*, for exceptants.

*Albert W. Sansom* and *Morris H. Sheer*, contra.

VAN DUSEN, P. J., December 6, 1946.—The principal of this fund, according to the will of Alma Taylor, is to be distributed to the issue of William McDaniels, her brother. William had a daughter, Rachel, who had a son, George. Rachel died before her father, and her son George claims as one of the issue of William. The auditing judge made no award to him, concluding among other things that he was not a legitimate child, and that only legitimates were entitled. It was held in Appel et al. v. Byers et al., 98 Pa. 479, following the English cases, and quoting from Ellis v. Houstoun, 10 L. R. Ch. D. 236, 241: ". . . I believe the law is firmly settled, . . . that where you have a bequest of property to a class of persons, children, nephews or nieces or any class you like . . . and you find in the class designated legitimate members—you never can admit illegitimate persons to share with them." To the same effect is Kemper v. Fort, 219 Pa. 85.

Rachel had been married to one Atkinson who died two years before George's birth. It is asserted that

Rachel did not marry again, and that George was born out of wedlock. George was legally adopted by a family named Sloan when he was about two years old.

Did the Act of 1901, hereafter referred to, legitimate him, at least so far as the mother and her side of the family are concerned? Did the adoption bar him from participating in the distribution under the will of Alma McD. Taylor, the sister of his natural maternal grandfather?

A child born out of wedlock got little help from the common law. Legitimation by marriage of the parents, and inheritance from and through the mother are statutory. The illegitimate child seems to be a favorite of the statute law. See Commonwealth v. Mackey, 222 Pa. 613. Almost every volume of the pamphlet laws down to the Constitution of 1874 contains special acts legitimating persons. The first general statute was the Act of April 27, 1855, P. L. 368, sec. 3, which gave an illegitimate child and its mother capacity to inherit from each other.

"Legitimacy is a status or social condition, and capacity to inherit is only one of its incidents": 10 C. J. S. §23, p. 106. Most of these special acts attempt to effect a general legitimation as to the mother, and it is asserted that sections 1 and 4 of the Act of July 10, 1901, P. L. 639, hereafter referred to, have this effect. Other statutes, like the Act of 1855, and section 15 (a) of the Intestate Act of June 7, 1917, P. L. 429, deal only with the right of inheritance.

Legitimation as to the mother would be effected by the statute in force at the birth of the child, and perhaps also any other statute enacted up to the time the question arises. If the statute does no more than to put the child among the next of kin of the mother for purposes of inheritance from or through her, the applicable statute would be that which was in effect at the time of her death; and, so far as concerns prop-

erty passing by will, certainly at the time of testator's death.

When this claimant was born in 1910 the Act of July 10, 1901, P. L. 639, 11 PS §1, was in effect. Section 1 provides:

"That illegitimate children shall take and be known by the name of their mother, and the common law doctrine of nullius filius shall not apply as between the mother and her illegitimate child or children. But the mother and her heirs, and her illegitimate child and its heirs, shall be mutually liable one to the other, and shall enjoy all the rights and privileges one to the other, in the same manner and to the same extent, as if the said child or children had been born in lawful wedlock."

Section 2 deals with inheritance from or through the mother and child. Section 3 deals with the child's relation to other children of the same mother. And section 4 provides: "The intent of this act is to legitimate an illegitimate child and its heirs, as to its mother and her heirs; . . .". Sections 2, 3 and 4 were expressly repealed by the Intestate Act of 1917, P. L. 429, sec. 28. There is real doubt as to whether section 1 is repealed. The Penal Code of June 24, 1939, P. L. 872, appears inadvertently to have repealed this section instead of the Act of July 10, 1901, P. L. 638, which contains penal provisions, which is found on the same page of the statute book of 1901. Whether the attempted repeal of section 1 is within the title and subject matter of The Penal Code of 1939 is doubtful. There can be no doubt, however, that section 1 was in full force and effect at the time of the enactment of The Penal Code of 1939.

Consequently, we need not discuss whether the repeal of sections 2, 3 and 4 after claimant's birth could operate to destroy the status those sections gave him

at birth. Section 1 alone preserved his status for the purposes of this case.

When this testatrix (the sister of claimant's grandfather) died in 1938 and by her will dated 1935 gave property to the "issue" of William McDaniels, this claimant was one of such issue in fact, and was legitimate in law with respect to his mother, and therefore with respect to her father, though he may have been born out of wedlock.

Our conclusion is supported by Miller's Appeal, 52 Pa. 113. Rachel, daughter of Esther, was born out of wedlock. Esther's father in 1813 devised land to "the lawful issue of my said daughter Esther". Rachel married and had children and died, and later her mother, Esther, died. The special Act, No. 213, of March 31, 1854, P. L. 240, provided that Rachel, daughter of Esther "Shall have and enjoy all the rights and privileges of a child born in lawful wedlock, and shall be able and capable in law to inherit and transmit any estate whatsoever, as fully and completely and to all intents and purposes, as if she had been born in lawful wedlock." (Note that the enactment is not confined to Rachel's relations with her mother.) The court characterized the effect of the statute as follows (p. 115) :

"Now, it is evident that if Rachel had survived her mother, she would have been lawful issue within the meaning of the will, because, though not so by nature, she was made so by the supreme legislative power of the state. If the legislature can remove the taint of blood and make it inheritable, they did so in this instance. They declared that she should be as competent to inherit and transmit any estate whatsoever as if she had been born in lawful wedlock; and had she been born in lawful wedlock she would have inherited and transmitted this estate. And that, too, whether the words 'lawful issue,' be taken as words of limitation

or of purchase. If they were words of limitation and the devise had been of real estate, Esther would have taken an estate tail, and words which create an estate tail in real estate confer an absolute title upon the first taker in respect of personal estate. But if they were words of purchase and not of limitation, then, had Rachel survived her mother, she would have taken under the designation of lawful issue, directly from the testator by virtue of the Act of Assembly. Nor can this fairly be called a making of a new will by Act of Assembly forty years after the death of the testator. He must be presumed to have meant his words should have their appropriate legal effect, and at all times it is the province of the law-making power to define who shall be lawful issue. The law of every country regulates the succession to estates on the death of its citizens. The testator referred himself to the law for ascertainment of lawful issue. We do not therefore change his will when we say, it would have operated in favour of Rachel had she survived her mother. We simply give effect to the Act of Assembly, and like effect to the will."

It is true that some of this opinion seems to deal with the matter as if the question was as to who would take from Esther as her lawful issue, instead of who would take under the will of Esther's father as the lawful issue of Esther. But the opinion also recognizes the effect of status. ". . . though not so (lawful issue) by nature, she was made so by the supreme legislative power of the state." ". . . she would have taken under the designation of lawful issue, directly from the testator by virtue of the Act of Assembly."

To the same effect is Commonwealth v. Mackey, 222 Pa. 613, supra, in which it was held that one of the effects of the Act of 1901 was to exempt property passing from mother to child born out of wedlock from

collateral inheritance tax. Nothing is said in the Act of 1901 or in its title about taxes. But as "The expressed purpose of the act is to legitimate an illegitimate child as to its mother", the exemption followed. The court noted that already by the Act of 1855 the illegitimate child inherited from its mother. The decision seems to us to be founded on the proposition that legitimacy as a status as between mother and child is conferred by the statute on the child of an unmarried woman. See also Commonwealth v. Stump, 53 Pa. 132.

The several cases that rule that the word "issue" must be interpreted as meaning *lawful* issue (Appel et al. v. Byers et al., 98 Pa. 479, supra; Bealafeld v. Slaughenhaupt, 213 Pa. 565; Kemper v. Fort, 219 Pa. 85, supra) it will be found on examination, all interpreted wills that were written by a testator who died before section 1 of the Act of 1901, P. L. 639, was enacted. The importance of this distinction is emphasized in Patterson's Estate, 282 Pa. 396, where the court said, at page 402:

"Moreover, when reading cases involving the construction of wills and the rights of illegitimate children thereunder, decided prior to the Act of 1901, its absence at that time must be kept in mind."

The auditing judge also held that the adoption caused George to lose his status as one of the "issue" of William McDaniels. Neither section 16 (*b*) of the Intestate Act of 1917 nor the Act of April 13, 1887, P. L. 53, sec. 1 (whichever is applicable), attempts to do more than to regulate the right of inheritance. As said in Anderson's Estate, 23 D. & C. 332, the question is one of identity and not of the right of inheritance. Claimant is still the legitimated child of Rachel, and his status as such is not changed by the adoption. The limited effect of the statutes relating to adoption bring out by contrast the wider effect which we think

should be given to section 1 of the Act of 1901. Of course testatrix had the right to make her bequest to claimant either by name or class description, so the real question is whether he comes within the description of "issue". Physically he is certainly within that description and legally he has been made so by section 1 of the Act of 1901 so far as the mother's family is concerned. Patterson's Estate, 282 Pa. 396, is an analogous case. There it was held that since the Act of 1901 an illegitimate child was to be regarded as an afterborn child under section 21 of the Wills Act of June 7, 1917, P. L. 403, even though before 1901 it had been held that in absence of some qualifying expression the word "child" in legislative enactments, *as in legal parlance*, means only and exclusively a legitimate child (citing Overseers of the Poor of Forest City v. Overseers of the Poor of Damascus, 176 Pa. 116, 121). It remains but to be said that in absence of statute directing a different construction, the fact of adoption does not change claimant's description as issue of William McDaniels, whether being construed as made before or after the adoption. We are fortified in this conclusion by the fact that section 16(*b*) of the Intestate Act of 1917 expressly provided that an adopted person was not to be entitled to take from or through his natural relatives, whereas section 16(*b*) of the Wills Act of 1917 makes no such exclusionary provision.

The view we have taken of what we conceive to be the controlling questions makes it unnecessary to decide whether the learned auditing judge erred in his rulings and findings on the question whether claimant was actually a legitimate child born in lawful wedlock. Hence, the exceptions which raise this question, viz.: Numbers 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 13, 14, 15 16, 17, 18, 19 and 20, are dismissed pro forma.

The other exceptions are sustained to the extent indicated in this opinion, and the adjudication is modified by awarding a one-fifth share of principal and income to exceptant, George H. Sloan, and reducing the other awards proportionately, and, as thus modified, the adjudication is confirmed absolutely.